# UNITED STATES DISTRICT COURT

# DISTRICT OF CONNECTICUT

David E. ROBERTS, Administrator for the :
Estate of Gregory J. Roberts,                  :
       Plaintiff,                                 :
                                                       :
v.                                                        :
                                                       :   Case No. 3:04cv1318 (PCD)
NATIONAL RAILROAD PASSENGER      :   Case No. 3:04cv1622 (PCD)
CORPORATION,                                      :   Case No. 3:04cv2195 (PCD)
       Defendant/Third-Party Plaintiff    :
                                                       :
v.                                                        :
                                                       :
O&G INDUSTRIES, INC.,                          :
       Third-Party Defendant.                   :

## RULING ON MOTIONS FOR SUMMARY JUDGMENT

Defendant/Third Party Plaintiff National Railroad Passenger Corporation ("Amtrak")

moves [Doc. Nos. 89, 99] pursuant to Rule 56(c) of the Federal Rules of Civil Procedure for an

order (1) granting it summary judgment on its claim for contractual indemnification in the first

cause of action of its third-party complaint against Third-Party Defendant O&G Industries

("O&G") in Case Nos. 04cv1318 and 04cv2195; (2) directing O&G to defend Amtrak in the

actions; and (3) directing O&G to pay the amount of past costs, expenses, and reasonable

attorneys' fees due to Amtrak in connecting with these actions.  O&G, in addition to opposing

Amtrak's motion, moves [Doc. No. 149] separately for the entry of summary judgment in its

favor in each of the three consolidated actions, Case Nos. 04cv1318, 04cv1622, and 04cv2195.

Amtrak also moves for summary judgment and seeks an order dismissing Plaintiffs'

claims for punitive damages in Case Nos. 04cv1318, 04cv1622, and 04cv2195.  Plaintiffs, Peter

Quintiliani and David E. Roberts, administrator for the estate of Gregory J. Roberts, have filed a

memorandum opposing Amtrak's motion.

For the reasons that follow, Amtrak's motion is **granted in part and denied in part**, and O&G's motion is **denied**.

### I.      Background

On June 16, 2004, Gregory Roberts and Peter Quintiliani were employed by O&G and were working as carpenters installing false decking on Amtrak's right of way in East Haven, Connecticut.  Plaintiffs were contained in a piece of industrial equipment that extended over two Amtrak railroad tracks and were struck by an Amtrak diesel test train ("the test train").   Gregory Roberts died as a result of his injuries, and Peter Quintiliani suffered severe injuries but survived. For the sake of clarity when addressing the claims raised in the motions for summary judgment, the Court will outline more specific pre- and post-event facts.

On June 15-16, 2004, the test train was utilized to test Amtrak's Advanced Civil Speed Enforcement System ("ACSES") between New Haven and Old Saybrook.  At 3:15 a.m., the Test Train departed from Old Saybrook and traveled westbound towards New Haven.

On June 15, 2004, the day preceding the accident, an Amtrak crew dispatcher called Amtrak Conductor Annette Morman to work as a flagperson for work to be performed by O&G personnel in the vicinity of the Bridge on the evening of June 15 to June 16, 2004.  Morman had worked at Amtrak since May 22, 1997, first as an Assistant Conductor, and then as a Conductor since January 1, 1998, and was qualified to provide track protection for contractors.

On June 15, 2004, Morman reported for duty at approximately 10:00 p.m. and spoke with Fred Scarfi, a fully qualified Amtrak ET lineman.  Morman testified that Scarfi told her that he was "taking both tracks out," which she believed "meant taking the tracks out of service, which

means there would have been no train through [the] work zone." Morman also testified that she believed that tracks 1 and 2 were out of service because of her understanding of NORAC Rule 132 and her observation of ET Lineman Scarfi and Gholson placing grounds on the catenary system. Scarfi told Morman that he and another ET Lineman, Lee Gholson, would de-energize the overhead catenary system for track number 1 and that, following the scheduled passage of Amtrak's passenger train 67, he and Gholson would also de-energize the catenary for track number 2.

Track number 1 was de-energized at 10:09 p.m. and Scarfi and Gholson were issued a clearance. Scarfi and Gholson then placed non-fouling[1] grounding apparatus on the catenary for track number 1. At approximately 11:30 p.m. on June 15, 2004, O&G's work crew, which included Plaintiff Roberts, reported to work in the vicinity of the bridge. Some of the work the O&G crew intended to try to perform involved moving false decking within bays on the underside of the bridge. At that time, Scarfi held a job briefing for all of O&G's personnel concerning the de-energization of the overhead catenary system ("OCS") for track number 1. Morman did not participate in this briefing,[2] but held a separate track safety briefing for O&G employees. Scarfi and Gholson did not participate in Morman's briefing.

All of the O&G employees present at the bridge on June 15 and June 16 had attended

---

[1]The Amtrak Roadway Worker Protection Manual ("RWP") generally defines "fouling a track" as "the placement of an individual or an item if equipment in such proximity to a track that the individual or equipment could be struck by a moving train or on track equipment, in any event, the placement of an individual or equipment within four feet of the field side of the near running rail."

[2]Rule 316 of Amtrak's RWP provides that "prior to performing any task, which requires fouling a track or has the potential to foul a track, all roadway workers must participate in an RWP job briefing."

Amtrak's contractor safety training course prior to the Accident.  The Contractor Safety Course Handout identified the flagman as the authorized Amtrak employee who was qualified to protect contractor employees against the movement of trains and to obtain the use of the tracks. Following Morman's on-track safety briefing, O&G personnel went to work overhead on the bridge, and the work that they initially completed did not involve any fouling of the Amtrak tracks below them.  At approximately 12:12 a.m., on June 16, 2004, Amtrak passenger train 67 passed under the Bridge on track number 2.  Shortly thereafter, at 12:26 a.m., on June 16, the Amtrak Boston Power Director de-energized the overhead catenary system above track number 2 and issued a clearance to ET Lineman Scarfi.

Scarfi and Gholson then placed non-fouling grounding apparatus on the catenary for that track and held a second ET job briefing with O&G employees at approximately 12:45 a.m., and advised them that the catenary for track numbers 1 and 2 were de-energized and grounded.  As with the earlier ET briefing, Morman did not participate in this second ET briefing held by Scarfi and O&G personnel.  At approximately 12:39 a.m., Morman placed a phone call to Assistant Chief Dispatcher Robert McCall in Boston, asking if he knew of any extra trains that night. McCall advised Morman that there was a rail train near Old Saybrook and a work train that may have been cancelled and further advised that, as far as he knew, there were no extra ACELA passenger trains or extra moves that night.  Morman did not request foul time during her conversation with McCall.  Dispatcher Steven Pratt was also working at the CETC Center, functioning as Amtrak's Shoreline dispatcher between the hours of midnight and 4:00 a.m. on June 16, 2004.  Pratt was authorized to issue foul time for track numbers 1 and 2 near the Bridge. Morman, however, did not contact Pratt prior to the accident.

4

McCall first learned of the presence of the Amtrak Test Train on track in the Old Saybrook vicinity after his conversation with Morman.  At that time, the train was approximately thirty miles from the bridge.  McCall allegedly did not contact Morman to inform her of the test train allegedly because she had not requested foul time.

At approximately 3:15 a.m., Plaintiffs Roberts and Quintiliani boarded an O&G manlift and positioned it so that the boom of the lift extended through the columns of the Bridge, extended the boom towards track number 2 and began to reposition false decking in the bays of the bridge.  Morman testified that she first became aware that the test train was traveling in the direction of the Bridge when she heard a hot box detection transmission over the portable radio.  Morman was standing about 100-150 feet East of the Bridge when she heard this transmission.  Morman attempted to warn the O&G workers to clear the track by running towards the track and yelling "train."  Scarfi was just exiting his vehicle when he saw Morman running towards the track, and he testified that he yelled "emergency" into the radio in his truck.  Scarfi then ran after Morman towards the tracks, and the test train reached the Bridge as he arrived at the tracks.  Scarfi estimated that forty-five seconds elapsed from the time Morman exited her truck and began to run toward the Bridge and the time the Test Train was involved in the collision with O&G's equipment.  As a result of the collision, Gregory Roberts died and Plaintiff Quintiliani suffered non-lethal injuries.

After the accident, Amtrak conducted an investigation into the events resulting in the collision.  The train driver's post-accident toxicological results were negative.  Amtrak's investigation revealed, however, that Morman had failed to fully comply with foul time procedures concerning O&G's false decking work within the manlifts on June 16, 2004.

5

## II.      Standard of Review

A party moving for summary judgment must establish that there are no genuine issues of

material fact in dispute and that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56©;

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

"A party opposing a properly brought motion for summary judgment bears the burden of going

beyond the pleadings, and 'designating specific facts showing that there is a genuine issue for

trial.'" Amnesty Am. v. Town of W. Hartford, 288 F.3d 467, 470 (2d Cir. 2002) (quoting Celotex

Corp. v. Catrett, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). In determining

whether a genuine issue has been raised, all ambiguities are resolved and all reasonable

inferences are drawn against the moving party.  United States v. Diebold, Inc., 369 U.S. 654,

655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962);  Quinn v. Syracuse Model Neighborhood Corp., 613

F.2d 438, 445 (2d Cir. 1980). Summary judgment is proper when reasonable minds could not

differ as to the import of evidence.  Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991).

"Conclusory allegations will not suffice to create a genuine issue." Delaware & H.R. Co. v.

Conrail, 902 F.2d 174, 178 (2d Cir. 1990).  Determinations as to the weight to accord evidence or

credibility assessments of witnesses are improper on a motion for summary judgment as such are

within the sole province of the jury.  Hayes v. N.Y. City Dep't of Corr., 84 F.3d 614, 619 (2d Cir.

1996).

## III.      Discussion

 Amtrak moves for the entry of summary judgment with respect to Plaintiffs' claim for

punitive damages.  Amtrak also seeks a grant of partial summary judgment on the first cause of

action in each of its third-party complaints against O&G in Case Nos. 04cv1318 and 04cv2195.

More specifically, Amtrak requests that the Court enter judgment ordering O&G, pursuant to the parties' indemnification agreement, to defend and indemnify it as to Plaintiffs' claims.  O&G argues that summary judgment should enter in its favor because the contract claims that Amtrak alleges are barred by section 52-572k of the Connecticut General Statutes and the articulated public policy of the State.  O&G also argues that the common law indemnification claims cannot be sustained because under the undisputed facts Amtrak cannot prove that O&G has exclusive control over the accident site and surrounding circumstances.

## A.    Punitive Damages

Amtrak concedes that Morman negligently performed her duties, but does not concede that any other employee conduct was inappropriate.  Plaintiffs, however, argues that Amtrak's failure to reprimand other employees or admit inappropriate conduct beyond that of Morman results in Amtrak's adoption or ratification of their action for purposes of liability for their alleged misconduct.  More specifically, Plaintiffs have highlighted the disputed issues of material fact regarding Amtrak's alleged reckless (1) performance of  joint job briefings, (2) dispatch work, (3) training of flagman Morman, (4) use or lack of use of safety equipment, (5) failure to communicate with Morman regarding the need for foul time, and (6) recklessness in not issuing bulletin orders.  These allegations are explained more fully below.

## I.    Joint Job Briefings

Plaintiffs argue that Amtrak revised its job briefing form in 1999 to include specific details regarding the fouling of tracks because it knew or should have known that a revised form was a critical safety issue.  They contend, however, that Amtrak did not train and instruct its flagmen and linemen so as to enforce the use of the revised form, and recklessly failed to replace

7

the old job briefing form with the revised form.  Furthermore, Plaintiffs point to the testimony of

both Scarfi and Morman who testified that Amtrak had never instructed them to conduct joint job

briefings.  Plaintiffs argue that the death of Roberts and injuries of Plaintiff Quintiliani would

have been avoided if they had conducted a joint job briefing because neither one of them had

obtained foul time.

**ii.      Dispatch Work**

Plaintiffs argue that the dispatcher transfer sheet for the evening of the accident provided

that an extra train was running on the evening of June 15 and the morning of June 16, and that

Amtrak's Assistant Chief Dispatcher ("ACD") failed to review the sheets before starting his shift

as an ACD.   Plaintiffs assert that Amtrak's ACD consciously chose not to call back Morman

after learning that an additional train was operating in her vicinity and that if Amtrak's ACD had

provided Morman with the correct information, either at the time of her initial phone call or

through a follow-up conversation, the accident would not have occurred.  Because Amtrak has

not taken exception to the ACD's action or inaction, Plaintiffs allege that Amtrak has ratified and

adopted their conduct.

**iii.     Morman's Training**

Plaintiffs also argue that Amtrak failed to train Morman that electrical grounds could be

applied to the track's overhead power system that did not foul the track.  Plaintiffs argue that if

she was aware of that possibility, she would have requested foul time.

**iv.     Reckless Use of Safety Equipment**

Plaintiffs argue that Amtrak did not provide Supplemental Shunting Devices to its

flagmen conductors, including Morman, or to its linemen, notwithstanding the fact that Amtrak's

Roadway Protection Manual ("RWP Manual") requires that a SSD be used whenever equipment

will be used to foul a track and Amtrak's Job Briefing form provides that SSDs "can and should

be used any time equipment fouls the tracks."  In support of this proposition, Plaintiffs point to

the deposition testimony of Morman and Scarfi.  Morman stated that "mostly no one" had been

issued the shunting devices, and Scarfi testified that "[i]n our department we don't use them."

Plaintiffs allege that the accident would not have occurred if SSDs were utilized because the train

would have automatically stopped before it reached the bridge on which the accident occurred.

**v.    Amtrak Manager's Failure to Communicate with Morman Regarding the Need for Foul Time**

        Plaintiffs also argue that Amtrak's project manager knew that O&G's workers and

equipment were going to foul the tracks at the Bridge site on the date of the accident.  In support

of this proposition, Plaintiffs proffered a document entitled "demo schedule" on which O&G had

indicated that the tracks would need to be taken out of service to perform their work.  Plaintiffs

allege that Amtrak's Project Engineer was aware that O&G's employees were performing work

requiring foul time, but consciously chose not to discuss the issue of foul time with Morman

when she called to ask whether any extra trains were operating in her vicinity.  Plaintiffs

highlight the testimony of Project Engineer Bencivengo, who testified that there was no "doubt in

[his] mind [that the] . . . false decking work with the manlifts was going to foul the tracks that

night."  Plaintiffs also point to the testimony of ACD Fournier, who explained that he had raised

the issue of foul time with a person without a specific request for it.  Plaintiffs argue that

Amtrak's failure to take exception to the Engineer's conduct results in its ratification or adoption

of his action.

**vi.    Amtrak's Failure to Issue Bulletin Orders**

Plaintiffs also allege that Amtrak recklessly failed to issue a thorough bulletin order, which is issued weekly to all Amtrak train crews, flagmen, linemen, and dispatchers, and includes, among other things, notification of potential safety hazards in various sections of the track.  Plaintiffs allege that although Amtrak issued a bulletin order the week of the accident, it failed to inform all employees that construction work was being done at the location.  Plaintiffs argue that if that information was contained in a bulletin order, the train would have to had stopped before passing the site of the Accident.  In support of this proposition, they point to the testimony of Morman, who indicated that a bulletin order indicating that a test train was in the vicinity of the accident "would have made [her] aware that there was an unscheduled train out there that [she] would have to be aware of."  (Morman dep. at 43.)

In its motion for summary judgment, Amtrak focuses solely on Morman's admittedly improper actions, and argues not only that her actions did not constitute wilful or wanton misconduct, but that there is no probative evidence to support a reasonable finding that high-ranking managements employees at Amtrak engaged in wilful or wanton misconduct or approved of such conduct by Morman or any other lower-level Amtrak employees.  See, e.g., Maisenbacker v. Society Concordeia, 71 Conn. 369, 42 A. 67 (1899) (explaining that "no recovery of exemplary damages can be had against a principal for the tort of an agent or servant, unless the defendant expressly authorized the act as it was performed, or approved it, or was grossly negligent in hiring the agent or servant.") (internal quotation marks omitted).   Plaintiffs, however, as highlighted above, have proffered testimony in support of the proposition that Amtrak failed to properly train employees regarding the appropriate procedure for conducting

10

joint job briefings, failed to issue a thorough bulletin order, failed to require the use of SSDs, and failed to train Morman that not all electrical grounds fouled a track.  Even assuming that Amtrak never expressly authorized Morman's conduct as she performed it or approved of it, Plaintiffs have proffered evidence regarding Amtrak's, and not solely Morman's, allegedly reckless conduct.  Plaintiffs have therefore established the presence of genuine issues of material fact as to whether Amtrak acted recklessly and whether its conduct "involved a risk to others which is substantially greater than that which is necessary to make . . . [its] conduct negligent." See Matthiessen v. Vanech, 266 Conn. 822, 831, 836 A.2d 394 (2003).  Because a jury could properly award punitive damages if it determined that Amtrak acted recklessly, see id., it would not be appropriate to summarily exclude the issue from the jury's consideration.

Amtrak also argues that Plaintiffs may not rely on opinion testimony from experts offered as an ultimate opinion of fact.  Although the Court agrees with the legal foundation of Amtrak's argument, Plaintiffs in this case rely primarily on the testimony of Amtrak workers and not, as Amtrak argues, expert testimony.

Finally, Amtrak argues that Plaintiffs are barred from introducing evidence in support of any claim involving allegations that Amtrak failed to have in place safety standards that are, in fact, the subject of FRSA regulations. More specifically Amtrak argues that Federal preemption doctrine would apply to any claim that the test train was operating at an excessive speed, as the train was indisputably traveling within the maximum speed limit at the time the Bridge first came into view.  Amtrak further argues that the Federal preemption doctrine would similarly apply to any claim that Amtrak failed to have had in place safety standards that are, in fact, the subject of FRSA regulations.  Amtrak, however, has not pointed to any particular FSRA regulation that

11

could reasonably be considered to preempt Plaintiffs' claims addressed in this section. Amtrak's brief is limited to the two specific examples discussed above, and Plaintiffs do not raise either of those issues in their memorandum in opposition.

Amtrak's motion for summary judgment with respect to Plaintiff's punitive damages [Doc. N o. 99] claims is denied.

**B.      Indemnification**

O&G has moved, and Amtrak has opposed its motion, for summary judgment on Amtrak's claim for contractual indemnification are barred by the provisions of section 52-572k of the Connecticut General Statutes and the articulated public policy of the State of Connecticut. Amtrak has also filed a motion for summary judgment, which O&G opposed, requesting that the Court grant it summary judgment in its favor with respect to its claims for contractual indemnification against O&G in Case Nos. 04cv1318 and 04cv2195.

The Court has already set forth the facts leading up to the accident. For purposes of resolving the present issue, however, additional background information is necessary. O&G was performing construction work on Amtrak's property pursuant to a Temporary Permit to Enter Property (hereinafter "the contract"). The permit authorized O&G to enter property owned and/or controlled by Amtrak "for purposes of reconstructing O.H. Bridge 78.02, I-95 (CDOT Project 42-122) in East Haven, State of Connecticut." The contract contained an indemnification provision providing in relevant part:

INDEMNIFICATION

The permittee shall defend, indemnify, and hold harmless Railroad, its officers, directors, employees, agents, servants, successors, assignees and subsidiaries, irrespective of their negligence or fault, from and against any and all losses and liabilities, penalties, fines, forfeitures, demands, claims causes of action, suits, costs, and expenses incidental thereto (including costs of defense and attorney's fees), which any or all of them may hereinafter incur, be responsible for, or pay as a result of injury, death, disease or occupational disease to any person and for damage . . . to or loss of any property, including property of Railroad, arising out of or in any degree directly or indirectly caused by or resulting from activities of or work performed by Permittee, its officers, employees, agents, servants, contractors, subcontractors, or any other person acting for or by permission of Permittee.  The foregoing obligation shall not extend to situations where the negligence or fault of Amtrak, its officers, directors, employees, agents, servants, successors, assigns, or subsidiaries is the sole causal negligence or fault, except that it shall so extend to injury, death, disease, or occupational disease to employees of Permittee, its agents, servants, contractors, subcontractors, or any other person acting for or by permission of the Permittee

O&G argues that the indemnification agreement is in direct violation of section 52-572k

of the Connecticut General Statutes, which provides in relevant part:

(a) Any covenant, promise, agreement or understanding entered into in connection with or collateral to a contract or agreement relative to the construction, alteration, repair or maintenance of any building, structure or appurtenances thereto including moving, demolition and excavating connected therewith, that purports to indemnify or hold harmless the promisee against liability for damage arising out of bodily injury to persons or damage to property caused by or resulting from the negligence of such promisee, such promisee's agents or employees, is against public policy and void, provided this section shall not affect the validity of any insurance contract, workers' compensation agreement or other agreement issued by a licensed insurer.

O&G argues further that this statute is not preempted by 49 U.S.C. § 28103, which expressly

permits Amtrak to enter into indemnification agreements.  More specifically, 49 U.S.C. § 28103

(2005) provides:

Limitations on rail passenger transportation liability

(a) Limitations.

(1) Notwithstanding any other statutory or common law or public policy, or the nature of the conduct giving rise to damages or liability, in a claim for personal injury to a passenger, death of a passenger, or damage to property of a passenger arising from or in connection with the provision of rail passenger transportation, or from or in connection with any rail passenger transportation operations over or rail passenger transportation use of right-of-way or facilities owned, leased, or maintained by any high-speed railroad authority or operator, any commuter authority or operator, any rail carrier, or any State, punitive damages, to the extent permitted by applicable State law, may be awarded in connection with any such claim only if the plaintiff establishes by clear and convincing evidence that the harm that is the subject of the action was the result of conduct carried out by the defendant with a conscious, flagrant indifference to the rights or safety of others. If, in any case wherein death was caused, the law of the place where the act or omission complained of occurred provides, or has been construed to provide, for damages only punitive in nature, this paragraph shall not apply.

(2) The aggregate allowable awards to all rail passengers, against all defendants, for all claims, including claims for punitive damages, arising from a single accident or incident, shall not exceed $ 200,000,000.

(b) Contractual obligations. A provider of rail passenger transportation may enter into contracts that allocate financial responsibility for claims.

(c) Mandatory coverage. Amtrak shall maintain a total minimum liability coverage for claims through insurance and self-insurance of at least $ 200,000,000 per accident or incident.

(d) Effect on other laws. This section shall not affect the damages that may be recovered under the Act of April 27, 1908 (45 U.S.C. 51 et seq.; popularly known as the "Federal Employers' Liability Act") or under any workers compensation Act.

(e) Definition. For purposes of this section--
  (1) the term "claim" means a claim made--
    (A) against Amtrak, any high-speed railroad authority or operator, any commuter authority or operator, any rail carrier, or any State; or
    (B) against an officer, employee, affiliate engaged in railroad operations, or agent, of Amtrak, any high-speed railroad authority or operator, any commuter authority or operator, any rail carrier, or any State;
  (2) the term "punitive damages" means damages awarded against any person or entity to punish or deter such person or entity, or others, from engaging in similar

behavior in the future; and

  (3) the term "rail carrier" includes a person providing excursion, scenic, or museum train service, and an owner or operator of a privately owned rail passenger car.

O&G argues that the parties' indemnification agreement is void as violative of both section 52-572k of the Connecticut General Statutes and public policy.  O&G contends further that 52-572k is not preempted by section 28103 because section 28103 is limited to claims by passengers, which Plaintiffs in this case were not.  In support of this proposition, O&G points to the title of the statute, "Limitations on rail passenger transportation liability," and the language in subsection (a), which is specifically limited to punitive damages for claims by passengers.  Although O&G concedes that the statutory definition of claims is not limited to passenger claims, it argues that the statute can only reasonably be interpreted as applying to claims made by passengers.  O&G also argues that the legislative history of the statute supports this limitation.

Amtrak counters that subsection (b), providing that "[a] provider of rail passenger transportation may enter into contracts that allocate financial responsibility for claims," is not limited to claims by passengers.  Amtrak also points to the definition of "claims" set forth in subsection (e)(1)(A), which defines a "claim" as a claim made:

  (A) against Amtrak, any high-speed railroad authority or operator, any commuter authority or operator, any rail carrier, or any State; or
    (B) against an officer, employee, affiliate engaged in railroad operations, or agent, of Amtrak, any high-speed railroad authority or operator, any commuter authority or operator, any rail carrier, or any State

To determine whether federal law preempts a state statute, the Court looks to congressional intent.  FMC Corp. V. Holliday, 498 U.S. 52, 56, 111 S. Ct. 403, 112 L. Ed. 2d 356 (1990).  "Preemption may be either express or implied, and 'is compelled whether Congress'

command is explicitly stated in the statute's language or implicitly contained in its structure and purpose.'" Id. (quoting Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 95, 77 L. Ed. 2d 490, 103 S. Ct. 2890 (1983)).  "Absent explicit pre-emptive language, Congress' intent to supersede state law in a given area may nonetheless be implicit if a scheme of federal regulation is "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," if "the Act of Congress . . . touch[es] a field in which the federal interest is so dominant that  the federal system will be assumed to preclude enforcement of state laws on the same subject," or if the goals "sought to be obtained" and the "obligations imposed" reveal a purpose to preclude state authority.   Wisconsin Pub. Intervenor v. Mortier, 501 U.S. 597, 605, 111 S. Ct. 2476; 115 L. Ed. 2d 532 1991) (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 91 L. Ed. 1447, 67 S. Ct. 1146 (1947).  If a federal statute does not occupy an entire field, state law may be preempted to the extent that it renders compliance with the federal statute a physical impossibility or "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  Id. (Internal quotation marks omitted).

The statute at issue does not contain an express preemption clause and is not so pervasive as to make reasonable the inference that Congress left no room for the states to supplement it.  In fact, subsection (a) specifically applies to punitive damages "to the extent permitted by applicable state law."  The question in this case is therefore whether section 52-572 is preempted to the extent that it renders compliance with section 28103 a physical impossibility or stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

**a.      The Title of the Statute**

The Court finds unpersuasive O&G's reliance on the title of the statute–"Limitations on

16

rail passenger transportation liability"–for the proposition that the statute is limited to passenger

claims and thus does not preempt section 52-572k of the Connecticut General Statutes in this

case, as neither Roberts nor Quintiliani were Amtrak passengers in this case.  It is undisputed that

Amtrak is a provider of rail passenger transportation.  The fact that the title of the statute refers to

limitations on Amtrak's liability is not inconsistent subsection (a), which is subtitled

"Limitations," and sets forth the standard by which punitive damages may be awarded "in a

claim for personal injury to a passenger, death of a passenger, or damage to property of a

passenger arising from or in connection with the provision of rail passenger transportation."

Subsection (a) therefore specifically limits its applicability to claims by a passenger.  Subsection

(b), however, entitled "Contractual obligations," provides that "[a] provider of rail passenger

transportation may enter into contracts that allocate financial responsibility for claims."  The term

"claims," which is defined in subsection (e)(1)(A) and (B), is not limited to claims by passengers

but, rather, defines the class of persons against whom a claim may be made for purposes of

28103.

> The title of a statute and the heading of a section cannot limit the plain meaning of
> the text. [Citations omitted]. For interpretative purposes, they are of use only
> when they shed light on some ambiguous word or phrase. They are but tools
> available for the resolution of a doubt. But they cannot undo or limit that which
> the text makes plain.

United States v. Roemer, 514 F.2d 1377, 1380 (2d Cir. 1975) (quoting Brotherhood of Railroad

Trainmen v. Baltimore R.R., 331 U.S. 519, 528-29, 91 L. Ed. 1646, 67 S. Ct. 1387 (1947)).  The

Court agrees with Amtrak that the statutory language is not ambiguous, and will not include

language that the legislature chose to exclude.  Because the legislature did not limit its definition

of "claims" to those made by passengers, and because the use of the term passenger is used

throughout the text of the statute, the Court concludes that subsection (b) is not limited to claims

by passenger but, rather, applies to all "claims" as defined in subsection (e).

    **b.**    **Preemption due to State law presenting an obstacle for enforcement of federal law**

Having concluded that the text of the statute permits Amtrak to enter into indemnification

agreements for all claims, not solely passenger claims, the Court must consider whether section

52-572k of the Connecticut General Statutes is preempted "to the extent that it renders

compliance with the federal statute a physical impossibility or stands as an obstacle to the

accomplishment and execution of the full purposes and objectives of Congress." Id. (Internal

quotation marks omitted).

O&G argues that the text of the original bill vis-a-vis the text of the statute as enacted

establishes the legislature's intent not to pre-empt section 52-572k of the Connecticut General

Statutes.  The bill, as originally proposed, provided:

> Indemnification Obligations.  Obligations of any party, however arising, including
> obligations arising under leases or contracts or pursuant to orders of an
> administrative agency, to indemnify against damages or liability for personal
> injury, death, or damage to property described in subsection (a) incurred after the
> date of the enactment of the Amtrak Reform and Privatization Act of 1997, shall
> be enforceable, notwithstanding any other statutory or common law or public
> policy, or the nature of the conduct giving rise to the damages or liability.

S. 738, 105th Cong. § 161 (1997).

> The statute as enacted provides:

> Contractual obligation.  A provider of rail passenger transportation may enter into
> contracts that allocate financial responsibility for claims.

49 U.S.C. § 28103(b) (2005).

O&G contends that the legislature's removal of the clause stating that the statute "shall be

enforceable notwithstanding any other statutory of common law or public policy" compels the conclusion that it did not intend for the statute to preempt state law.  O&G also points out, and Amtrak concedes, that the legislative history evidences the legislature's primary concern over Amtrak's ability to enter into indemnification agreements with the freight railroad companies over whose tracks Amtrak frequently operates, not with parties outside of that arrangement.  That concern is not present in this case as the dispute is between Amtrak and a third-party with whom it entered into an indemnification agreement.  Amtrak counters that, notwithstanding the legislature's primary concerns, the legislature chose broad language permitting Amtrak the authority to "enter into contracts that allocate financial responsibility for claims."

The Court's review of the legislative history confirms O&G's contention that the legislature was primarily concerned with Amtrak's ability to enter into indemnification agreements with the owners of rights-of-way.  In fact, the bill initially proposes was intended to insulate Amtrak from the impact of National Railroad Passenger Corp. V. Consolidated Rail Corp., 698 F. Supp. 951 (D.C. 1988), in which a federal district court voided an indemnification agreement between Amtrak and Conrail on the grounds that enforcing it would violate public policy because gross negligence on the part of the Conrail locomotive engineer was alleged as the cause of the accident.  The decision in Conrail resulted in freight railroads questioning the validity of their indemnification agreements, and the legislature was concerned that the freight railroads and Amtrak may, if an accident occurred, litigate with each other, resulting in higher settlement figures and judgments to plaintiffs, decreased goodwill between the contracting parties, and a less efficient and financially sound Amtrak.  Furthermore, a House Report specifically references the facts of the Conrail case and highlights Amtrak's concern that the

enforceability of future indemnification agreements was uncertain.  Similarly, the Senate Report,

although not specifically referencing the facts of the Conrail case, acknowledges "the possibility

that state laws can nullify the indemnification contracts."  More specifically, the Senate Report

provided in relevant part:

> Subsection (b) of section 161 clarifies that rail passenger service indemnification
> agreements entered into by Amtrak and other parties are enforceable.  Amtrak and the
> freight railroads believe legislation is necessary to confirm the enforceability of
> indemnification agreements.  The indemnification agreements allocate the cost of liability
> among the agreement parties.  As long as there is the possibility that state laws can nullify
> the indemnification contracts, Amtrak and a freight railroad could find themselves
> litigating against each other or concerning their obligations to injured third parties.
> Amtrak believes that such litigation inevitably would not only adversely impact its
> business relationship with its host freight railroads, but it would also lead to significantly
> higher outlays in settlements and judgments to litigants.

The Senate Report initially provides that the statute "clarifies that indemnification

agreements entered into by Amtrak and *other parties* are enforceable."  (Emphasis added.)  The

remainder of the Report relies upon Amtrak's testimony at hearings in which it expressed a fear

of state laws nullifying indemnification agreements entered into between it and freight railroads.

Although the Report explains that Amtrak and the freight railroads desired the legislation to

confirm the enforceability of the agreements, and is focused on Amtrak's reason for seeking the

provision, that fact does not compel the conclusion that Congress intended to limit the statute's

applicability solely to those between Amtrak and freight railroads.  The Court has already

concluded that the language of the statute does not restrict the parties with whom Amtrak may

enter into an indemnification agreement for claims.  Furthermore, the legislative history of the

statute reveals that Amtrak's financial condition had "reached a crisis stage" and that "Amtrak

could reach bankruptcy by the spring of 1998" if it did not receive the statutory reforms and

funding requested.  The Court concludes that construing the statute in this case as not preempting section 52-572k would violate both the plain language and spirit of the statute.  Accordingly, O&G's motion for summary judgment on Amtrak's contractual indemnification claim is denied.

## IV.    Conclusion

For the reasons stated above, Amtrak's motions for summary judgment with respect to Plaintiff's claim for punitive damages [Doc. N o. 99] is **denied**.  Amtrak's motion for summary judgment with respect to the enforceability of its contractual indemnification agreement with O&G [Doc. No. 89] is **granted**.  O&G's motion for summary judgment [Doc. No. 149] on the contractual indemnification agreement is **denied**.  Amtrak's claim for common law indemnification is denied as moot because the Court has already concluded that the contractual indemnification provision is valid

SO ORDERED.

Dated at New Haven, Connecticut, March  9 , 2006.

/s/
_____
Peter C. Dorsey
United States District Judge
