UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| David E. ROBERTS, Administrator for the | : | |
| Estate of Gregory J. Roberts, | : | |
|     Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | Case No. 3:04cv1318 (PCD) |
| NATIONAL RAILROAD PASSENGER | : | Case No. 3:04cv1622 (PCD) |
| CORPORATION, | : | Case No. 3:04cv2195 (PCD) |
|     Defendant/Third-Party Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| O&G INDUSTRIES, INC., | : | |
|     Third-Party Defendant. | : | |

**MEMORANDUM OF DECISION ON PLAINTIFF'S MOTION FOR A NEW TRIAL**

Pending is the Motion for a New Trial of Plaintiff David E. Roberts, Administrator for the Estate of Gregory J. Roberts Administrator. Three plaintiffs–David Roberts, Peter Quintiliani, and Laurel Quintiliani–filed a complaint against Defendant National Railroad Passenger Corporation ("Amtrak"). A jury returned a verdict of $1,425,000 for Plaintiff David Roberts and $1,425,000 for Plaintiff Peter Quintiliani. Laurel Qunitiliani, Peter's wife, received a verdict of zero dollars for her claim of loss of consortium. The jury also found against Plaintiffs' claims for punitive damages. David Roberts is the only Plaintiff seeking a new trial. For the reasons stated herein, Plaintiff's motion [Doc. No. 283] is **denied**.

**I.      Facts - Liability**

Plaintiff's claims arose from a collision of an Amtrak train with a lift device from which Peter Quintiliani and decedent Gregory Roberts, employees of O&G Industries, Inc. ("O&G"), were working on the underside of a road bridge (I-95) over Amtrak's shoreline tracks. That

section of the tracks was electrified, but an Amtrak worker had grounded the overhead power wires after the last–until morning–scheduled Amtrak train passed.  An Amtrak employee, Annette Morman, was assigned as a flag person to protect the site.  She conferred with the O&G crew and knew of their work above the tracks, which she believed were closed at the instance of the other Amtrak employee at the site.  As a precaution, however, she telephoned the Dispatcher's Office, in Boston, and inquired as to whether any unscheduled trains would be using the tracks.  She was told, by the Assistant Chief Dispatcher, Robert McCall, that he did not know of any, and Morman did not take any further action to secure the tracks where the O&G crew was working.

     As was readily apparent from a display board in the Dispatcher's office, there was an extra train on the shoreline tracks in Old Saybrook which was due to pass through the O&G work area before returning to New Haven.  McCall did not inquire of the dispatcher responsible for the tracks in the O&G work area, who was sitting but a few feet away and who was responsible for knowing whether trains were or would be using the tracks for which he was responsible.  Nor did McCall communicate with Morman or the area dispatcher when he learned of the extra train by overhearing the area dispatcher refer to the extra train in a later telephone conference between the latter and the extra train's engineer.  That train eventually proceeded west, to New Haven, in the normal course.  The engineer was unaware of the work fouling his clear path at the work site until he rounded a curve and saw, a short distance ahead, the lights at the work site.  As the extra train was powered by a diesel locomotive, it was not stopped by the grounding of the power wires at the site.  As Morman was unaware of the extra train and had taken no steps through the area dispatcher to halt traffic at the work site, the extra train came upon the site at a normal speed

and, despite the application of its emergency brakes, was unable to stop in time to avoid colliding with the workers' lift device.

A short distance to the east of the site, a heat sensor would alert an engineer of a "hot box," the overheating of wheel bearings on his train. The signal it emitted as an "all clear" also reported the passing of the train and was audible on Morman's equipment. Hearing same, Morman sought to retrieve her cell phone and shouted to the O&G workers. There was not, however, enough time to call the train engineer or avoid the collision.

Peter Quintiliani was able to see the headlight of the oncoming train and heard its whistle in time to jump from the lift before the collision, as a result of which he sustained severe injuries. David Roberts was observed trying to disconnect his safety belt but was unable to do so before the collision. He suffered massive injuries died instantaneously.

After an investigation, Amtrak's area Superintendent found no fault with McCall but laid the cause of the accident solely on Morman for not seeking foul time for the tracks in the area of the site. Foul time is an Amtrak description of the status of tracks when train operation in the area is stopped as impeded by obstructions or activity upon or adjacent to the tracks. Amtrak terminated her employment. No evidence was offered to explain why she was held for a failure to act in the absence of information that the extra train was to pass through the work site until it was too late to take preventative measures. McCall was not faulted or disciplined for his conduct. There was evidence presented regarding other methods of informing involved employees of train scheduling, but Amtrak did not utilize these methods.

Movant points to the fact that the jury promptly requested a playback of testimony that bore on the issue of recklessness when the verdict form posed that as the last question. That

sequence is not regarded as of significance as the jury was not instructed to consider the issues in any order.

Amtrak admitted liability for the accident, leaving Plaintiffs to prove that its conduct was reckless in support of its claim for punitive damages.

## II.     DISCUSSION

### A.     Recklessness

As the jury found that Amtrak's conduct was not of a nature to justify punitive damages, its right to a jury trial as provided in the Seventh Amendment to the United States Constitution controls unless, as a matter of law, the verdict was so contrary to the evidence as to constitute serious error or a miscarriage of justice.  Farrior v. Waterford Bd. of Educ., 277 F.3d 633, 635 (2d Cir. 2002); U.S. CONST. amend. VII. ("no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law").  Plaintiffs had the burden of proof and thus have a heavy burden of now showing that the verdict was not within the range of findings permitted by the evidence.  In support of its first argument for a new trial of the recklessness claim on the ground that the verdict manifested a compromise, Plainitff cites Mekdeci v. Merrell Nat. Labs, Div of Richardson-Merrell, Inc., 711 F.2d 1510, 1513-1515 (11th Cir. 1983) and Atkins v. New York City, et al, 143 F.3d. 100, 104 (2d Cir. 1999).  Plaintiff relies on the length of the jury deliberation (three days), the early request for a playback of Amtrak employees' testimony in view of the finding on punitive damages being the last question on the jury verdict form, and the request to make a statement with the verdict.  The jury instruction, without challenge, required the jury to consider whether Amtrak, through its employees, had acted with a disregard and indifference to the safety of others.  It is presumed that

the jury followed the instruction.  Bingham v. Zolt, 66 F.3d 553, 563 (2d Cir. 1995).  One of the three days was partially consumed by a replay of testimony.  It would be speculative to allot any amount of the deliberation time to the issue of recklessness since the jury also decided the amount of damages, which was significant for two plaintiffs.

Plaintiff also argues that the rejection of the claim for punitive damages defies the clear weight of the evidence.  As noted above, the facts leading up to the accident were not seriously disputed, as Amtrak had admitted liability.  Thus Plaintiffs' burden was to prove that the conduct of Amtrak's employees rose beyond the admitted negligence to a degree of recklessness.  That the conduct of the persons principally involved–McCall and Morman–in failing to avoid the risk of injury as occurred from the train coming to pass, constituted a breach of the duty owed to plaintiffs, was fixed by Amtrak's admission of liability.  Whether that conduct was higher in the realm of breaches of duty was a question of degree.

The point at which conduct, concededly negligent, rises to the level of recklessness is, by nature, imprecise.  As noted, Morman was not provided with information about the extra train and was not shown to have failed to avail herself of other sources of information which would have called for her to ask for foul time or to have called the train engineer.  When she learned of the approach of the extra train, a little over a minute before the accident, her failure to call the train engineer was not so flagrant that the jury could not have found it to have been less than reckless.  Amtrak's failure to use other means of communication about train schedules could also be found to have involved a lesser degree of diligence in alerting personnel to train operation and could have been found to have justifiably relied on the methods by which Morman should have been informed of the extra train.  McCall's response to Morman, in ignorance of the fact of the

extra train and his later failure to flag the problem to her and/or to the shoreline dispatcher, while justifiably seen as inexcusable, could be found to have been less than reckless in the absence of his knowing the actual conditions at the work site, i.e., the O&G crew's exposure to passing trains, although obviously he should have known there were circumstances which prompted Morman's inquiry.

Although the claim for punitive damages was disputed, the presented question of liability was not so complex as to raise a question as to the integrity of the deliberations and verdict. Because the question of what degree of fault would apply to Amtrak's conduct, beyond the admitted negligence, was one of fact for a jury to decide, because Plaintiffs bore the burden of proof on the issue, and because the facts cannot be said to sustain only a finding of recklessness on the part of Amtrak, the jury's rejection of the claim for punitive damages must stand. This is not a case where a jury found liability but awarded no significant damages. A substantial award was made to the Roberts Estate and to Peter Quintiliani. The motion for a new trial on this issue is denied.

### B.  Roberts' Damages - Facts

The elements of damage presented to the jury, without objection, for its assessment as to Gregory Roberts included his confrontation with an imminent collision with the train, his instantaneous death, his loss of enjoyment of life, and his loss of earning capacity. There was evidence from co-Plaintiff Quintiliani's observation and Roberts' injuries that for up to fifteen seconds, Roberts could have observed the oncoming train before he was struck. His instantaneous death precluded damages for post-injury pain and suffering. He was forty-six years old at the time of his death and there was evidence of his life expectancy extending for 31 years

beyond the date of the accident. He was not married and left no children, a fact that movant decries Amtrak's flagging, though he notes that Roberts was living with and providing for his aging mother and that he enjoyed spending time with two nephews. He was shown to have enjoyed outdoor activity and travel. He was employed as a carpenter by O&G for four years, his prior pay level being at best one-half his O&G compensation, which is probably related to his varying employment. An economist pegged his income loss at $940,000. His funeral expense was shown to be $3,781. The award to his estate was $1,425,000.

### C. Roberts' Damages - Discussion

The jury was instructed that a claimant has the burden of proof as to damages and that their award, considering the elements noted above, was to be in an amount reasonably proven to be fair, just, and reasonable compensation. It was also instructed that its function was to determine the credibility and weight of the evidence from all witnesses, including expert witnesses. As noted above, the jury is presumed to have adhered to the court's instructions and the parties are entitled to a jury's verdict unless, on review, it is shown that the verdict is so "contrary to the weight of the evidence" as to be seriously erroneous or a miscarriage of justice, Farrior v. Waterford Bd. of Educ., 277 F.3d 633, 635 (2d Cir. 2002), and a shock to the court's conscience. In re Brooklyn Navy Yard Asbestos Litigation, 971 F.2d 831, 853 (2d Cir. 1992).

In arguing that the case comes within the ambit of the cited standards on review, movant first argues that clear evidence confirms that the verdict was the result of a compromise. The uncertainty in the absence of an objective standard or numerical quantification by which to measure the elements presented by the death of Gregory Roberts precludes any ready

determination that the verdict rendered falls outside the necessarily wide range of possible verdicts. The duration of the deliberation in this case was not reflective of anything other than the expected discussion of differing insights likely among a group such as made up the deliberating jury in this case. Given the inherent breadth of the principles applicable to the several elements, the deliberation duration is not regarded as significantly reflective of a compromise other than the necessary give and take as jurors reach for agreement as to fair, just, and reasonable compensatory damages. This view of the duration is all the more valid since the jury also deliberated and resolved the questions of liability for punitive damages and the claims of two other plaintiffs. The record suggests no difficulty in the deliberations nor any other indicia of the verdict being the result of a compromise. See Diamond D Enterprises USD, Inc. v. Steinsvaag, 979 F.2d 14, 17-18 (2d Cir.).

      Movant also flags the jury's request to make a statement at the rendering of their verdict. There is no reflection of what they had in mind and to speculate as to their intention, assuming agreement as to what was to be said, is inappropriate. To consider a possible disagreement as to the verdict is belied by the fact that the instructions required unanimity, consideration of the view of each juror, and amenability to altering one's view if that of another juror was found to be valid, but not just to reach a verdict thereby forfeiting a juror's obligation to reach his/her independent judgment. Disagreement with the verdict is belied by the Court's inquiry as to whether the verdict as returned and read represented the verdict of each and every juror, to which each is recorded as having assented. The request to make a statement is not regarded as indicative of a compromise verdict. It would be a guess that what the jury had in mind was to qualify their verdict. See, e.g., Mekdeci v. Merrell Nat. Labs, Div. of Richardson Merrell, Inc.,

8

711 F.2d at 1513-1515.  Movant's reliance on <u>Atkins v. New York City, et al.</u>, 143 F.3d 100, 104 (2d Cir. 1999) is misplaced as there the issue of a compromise in the verdict arose in the context of a verdict finding liability but awarding only nominal damages, and the decision was that a new trial on both liability and damages was required.  Here, as further discussed, liability for punitive damages was not found and one plaintiff, Peter Quintiliani, was awarded substantial damages, the propriety of which are not now questioned.

      Movant further points to the fact that the awards for Peter Quintiliani's injuries and for Gregory Roberts' death were identical.  Movant offers no explanation other than a compromise.  It is impossible to rationalize the Roberts award as reflective of a compromise while at the same time conceding that as to Peter Qunintiliani "the jury was cognizant of the various elements of damages for personal injury and apparently followed the court's instructions." [Pl.'s Mem. Support New Trial at 7.]  The Roberts' award may just have been coincidentally the same as the coalescence of the views of the several jurors as to the difficult problem of pricing losses following death when the only objective quantification was the funeral bill and the wage loss factor which was subject to evidence not necessarily within the experience of lay jurors.  Movant also cites the award of no damages to Laurel Quintiliani on her claim of loss of consortium, but it is noted that she makes no post verdict challenge of that verdict.

      Movant assumes that the award included the full amount of the asserted wage loss, $940,000, an assumption which is not absolutely assured.  The expert built his opinion on Roberts' earnings for the four years for which Roberts worked for O&G, disregarding his prior, lower earnings.  He assumed Roberts' living expenses without corroboration or documentation, but also without contrary evidence and concededly subject to increases in the cost of living.  He

9

calculated a discount rate for the fact that the amount paid now could earn income over Roberts' life expectancy which was evidenced as a statistic.  He also assumed that Roberts would continue in his employment at the rate he was being paid by O&G, allowed for an assumed rate of inflation, and assumed future income tax rates.  The projected wage loss was thus subject to a number of variables which were for the jury to weigh in deciding the credibility of the opinion.  There is no way of knowing what actual amount of wage loss was added into the jury's total award.  That uncertainty would effect the amount awarded for the loss of the enjoyment of life.  Movant assumes that amount to have been some $481,219.  The actual amount, however, would have been effected, and possibly increased, by the amounts added for the anticipation of the collision and for the wage loss.

Pricing the value of one's lost enjoyment of life is fraught with uncertainty.  Damages for death is not subject to any precise formulation.  Katsetos v. Nolan, 170 Conn. 637, 657, 368 A.2d 172 (1976).  Because the facts of cases vary, verdicts and settlements in other cases provide no definitive basis for comparison.  There is no fixed standard against which to judge a jury's evaluation.  Suggestions of inconsistency with the facts adduced at trial is not helpful, for the facts are decided by the jury and, as noted above, the facts of Roberts' life, employment, and activities were resolved by the jury in reaching its verdict.  Allowing for the uncertainty as to what credit the jury applied to the evidence which bore on that life, wage loss, and activities and the further uncertainty as to the value assigned by the jury to the several elements of Roberts' damages, it cannot be said that the Roberts' verdict was not "somewhere within the necessarily uncertain limits of just damages" nor that the "size of the verdict so shocks the sense of justice as to compel the conclusion that the jury was influenced by partiality, prejudice, mistake or

corruption." Gaudio v. Griffin Health Servs. Corp., 249 Conn. 523, 550-51, 733 A.2d 197 (1999). To hold otherwise would be an unwarranted disregard for the judgment of the jury which otherwise gave no indication of other than a conscientious effort to resolve in a just, fair manner the issues submitted to it. It would substitute the view of the court for that of the jury, particularly in the matter of attaching weight to evidence and resolving issues of credibility which the court is not permitted to do, Metromedia v. Fugazy, 983 F.2d 350, 363 (2d Cir. 1992), but is for the jury to credit and/or reject what evidence it will. Robinson v. Cattaraugus County, 147 F.3d 153, 160 (2d Cir. 1998). It would deprive defendant of its entitlement to the jury's resolution of disputed issues of fact. In considering the claim that the Roberts verdict flies in the face of the weight of the evidence, the evidence must be seen to support the verdict if reasonable. The verdicts cannot be said to be "logically incompatible," Stone v. Chicago, 738 F.2d 896, 899 (7th Cir. 1984), nor "irreconcilably inconsistent." Kraus v. Metro-North Commuter R.R. Co., No. 97 Civ. (08353) (LMS), 1999 U.S. Dist. LEXIS 23329, at *25-28 (S.D.N.Y. June 16, 1999). It cannot be said that the evidence, as the jury was entitled to weigh and credit it, cannot be seen as consistent with or supportive of the verdict and the damages awarded to the Roberts Estate. Bryd v. Blue Ridge Rural Elec. Co-op Inc., 356 U.S. 525, 540, 78 S. Ct. 893, 2 L. Ed. 2d 953 (1958).

**III.    Conclusion**

      For the forgoing reasons, as to all of the grounds raised by movant in support of its Motion for a New Trial, the motion is denied.

      Dated at New Haven, Connecticut this  31  day of May, 2006.

                                          /s/
                              Peter C. Dorsey
                   United States District Judge