UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| David E. ROBERTS, Administrator for the Estate of Gregory J. Roberts, | : : | |
|     Plaintiff, | : : | |
| v. | : : | Case No. 3:04cv1318 (PCD) |
| NATIONAL RAILROAD PASSENGER CORPORATION, | : : | Case No. 3:04cv1622 (PCD) Case No. 3:04cv2195 (PCD) |
|     Defendant/Third-Party Plaintiff | : : | |
| v. | : : | |
| O&G INDUSTRIES, INC., | : | |
|     Third-Party Defendant. | : | |

**RULING ON DEFENDANT/THIRD-PARTY PLAINTIFF'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR FOR A NEW TRIAL**

Defendant/Third-Party Plaintiff, National Railroad Passenger Corporation ("Amtrak"), moves, pursuant to Rules 50(b) and 59(a) of the Federal Rules of Civil Procedure, for judgment as a matter of law with respect to its claim against O&G Industries, Inc. ("O&G") for indemnity from the claims of Plaintiffs David Roberts, Administrator for the Estate of Gregory J. Roberts, and Peter Quintiliani, or for a new trial on the issue of whether Amtrak materially breached its contract with O&G, thereby relieving O&G of its obligations under the indemnity provision of the parties' Contract. For the reasons stated herein, Defendant's Motion for Judgment as a Matter of Law [Doc. No. 286] is **granted** and Defendant's Motion for a New Trial [Doc. No. 286] is **denied**.

**I.    BACKGROUND**

Prior to October 30, 2003, O&G, a commercial construction company, contracted with

the Department of Transportation of the State of Connecticut ("DOT") to perform work related to I-95 as it passed over Amtrak's tracks in East Haven, on a bridge (Bridge 181). To permit that work, Amtrak authorized O&G's employees to enter its property by an executed temporary permit which set forth the conditions of O&G's presence on the Amtrak property. On or about October 30, 2003, Amtrak and O&G entered into a contract (the "Contract"), which permitted O&G to enter onto Amtrak property to perform demolition and construction work on Bridge 181. Under the Contract, O&G specifically agreed to the following indemnity agreement:

> 3. INDEMNIFICATION: The Permitee ["O&G"] shall defend, indemnify and hold harmless Railroad ["Amtrak"], . . . *irrespective of their negligence or fault*, from and against any and all losses and liabilities, . . . claims, causes of action, suits, costs and expenses incidental thereto (including cost of defense and attorney's fees), which any or all of them may hereafter incur, be responsible for, or pay as a result of injury, death, disease or occupational disease to any person and for damage . . . *arising out of or in any degree directly or indirectly caused by or resulting from activities of or work performed by Permittee*, [or] its officers, employees, agents, servants, contractors, subcontractors, or any other person acting for or by permission of the Permittee. The foregoing obligation shall not extend to situations where the negligence or fault of Amtrak, its officers, directors, employees, agents, servants, successors, assigns or subsidiaries, is the sole causal negligence or fault, *except that it shall so extend to injury, death . . . to employees of the Permitee*, its agents, servants, contractors, subcontractors or any other person acting for or by permission of the Permittee. The foregoing obligation shall not be limited by the existence of any insurance policy or by any limitation on the amount of damage, compensation or benefits payable by or for Permittee or any contractor or subcontractor, and shall survive the termination of this permit for any reason . . . .

(Contract ¶ 3, Ex. A to Woolsey Decl.) (emphasis added.) There is no question as to O&G's compliance with the conditions on its work and the responsibility of Amtrak to operate its trains with due regard to protection of the work site and O&G's workers there engaged.

On June 15, 2004, O&G employees Peter Quintiliani and Gregory Roberts were scheduled to work under Bridge 181. A scheduled train passed through the work site at 12:30

a.m. on June 16, 2004, after which Amtrak employees grounded the catenaries over the tracks, as a result of which no electric-powered train could pass. An Amtrak employee, Annette Morman, was assigned as flag person to protect the site and the O&G employees.

There were no additional trains scheduled to pass through the site until the following morning. Ms. Morman, aware of the catenary grounding, was under the impression that the tracks were thus out of service. To ensure of the safety of the site for O&G's work, she called the office of the Chief Dispatcher for Amtrak in Boston and inquired if there were any extra trains scheduled to pass through the work site and was told by the Assistant Chief Dispatcher ("ASD") there were none, to his knowledge. He did not inquire in that regard of the dispatcher responsible for the shoreline tracks in the area of the work site, nor did he check the display board in front of him. Had he done either, he would have learned of an extra train which had proceeded from New Haven to Old Saybrook earlier on June 15 and was to return in the morning of June 16. Having no information of any trains to pass through the work site, Ms. Morman did not request foul time for the tracks, which would have shut them down for trains. Shortly after speaking to Ms. Morman, the ASD overheard the local dispatcher talking to the extra train engineer. Despite thus learning of the extra train and its westward movement, he did not advise the local dispatcher of Ms. Morman's call, nor did he inform Ms. Morman of the extra train. Had he done either, she would have learned of the need to request foul time for the tracks at the work site and the extra train would have been headed off. Having done neither, the extra proceeded west in a normal manner to and through the work site, not being precluded by the grounded catenary since the extra was powered by a diesel, rather than an electric, locomotive. The extra engineer did not know of the O&G workers' presence at the site until he rounded a curve just to the east of the site

3

and saw the crew's lights.  Due to his proximity to the O&G work site when he saw the crew's lights, the engineer was unable to stop the train before it collided with the work lift on which the O&G employees were working.

Plaintiff Quintiliani saw the train headlight in time to free himself from a safety belt on the lift and jumped clear, suffering injuries in the process.  Mr. Roberts was unable to free himself from his safety belt and he and the lift were struck by the train.  Mr. Roberts died instantly.   Plaintiff Quintiliani sued Amtrak for his personal injuries and Roberts' Estate sued for his death.

Amtrak filed a third-party complaint against O&G based on the indemnification agreement and hold harmless provision in the Contract.  O&G moved for Summary Judgment, arguing that Amtrak's claim for contractual indemnification was barred by the provisions of section 52-572k of the Connecticut General Statutes and the articulated public policy of the State of Connecticut.  Amtrak responded based on a 49 U.S.C. § 28103, which expressly permits Amtrak to enter into indemnification agreements and which Amtrak claimed controlled, to the preclusion of the Connecticut statute.  This Court ruled that 49 U.S.C. § 28103 controlled and preempted section 52-572k, such that Amtrak could invoke its claim for indemnification.  It did not rule on the question whether O&G was obliged by the indemnification provision, as that issue was not raised in the pleadings.  At trial, Amtrak admitted liability to Plaintiffs for compensatory damages but contested liability for punitive damages, asserting that its conduct was not reckless.  The jury returned a verdict on April 6, 2006, rejecting Plaintiffs' claim that Amtrak was reckless and awarding compensatory damages to Plaintiff Roberts in the amount of $1.425 million and to Plaintiff Quintiliani in the amount of $1.425 million.

Amtrak's claim for indemnification was contested by O&G on the ground that the indemnity agreement in the Contract was not in full force and effect on the basis that Amtrak breached their agreement by failing to operate its trains in the area of the work site safely. The Court submitted this question to the jury immediately following the verdict in the main action. The jury returned a verdict on April 7, 2006, finding, in response to question (1), that the indemnity agreement obligated O&G to indemnify Amtrak, but also finding, in response to question (2), that Amtrak breached a material term of the contract, thereby relieving O&G from any obligation to indemnify Amtrak. Accordingly, judgment was entered against Amtrak in the amount of the verdicts for the two plaintiffs.

## II.   STANDARD OF REVIEW

A court may grant a party's motion for judgment as a matter of law if "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed. R. Civ. P. 50(a). The court may enter judgment as a matter of law after a jury verdict, provided a pre-verdict motion is properly renewed. Fed. R. Civ. P. 50(b). The standard for granting a post-verdict Rule 50 motion for judgment as a matter of law is the same as for granting a motion for summary judgment pursuant to Rule 56. See Nadel v. Isaksson, 321 F.3d 266, 272 (2d Cir. 2003). Accordingly, viewing the evidence in the light most favorable to the nonmoving party, the court must deny judgment as a matter of law unless "the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached." Id. (internal quotations and citations omitted) (alteration in original).

### III.     DISCUSSION

Amtrak now moves for judgment as a matter of law to the effect that O&G must indemnify it in the amounts of the verdicts for plaintiffs and for its costs of defense.  Amtrak contends that Roberts and Quintiliani were, without question, O&G employees working in pursuit of O&G's contract with the DOT, that the injuries and death arose out of and in relation to the work of O&G for which they were permitted to be on Amtrak's property, and that the injuries and death were solely caused by negligence or fault of Amtrak employees for which Amtrak admitted liability.  Thus, Amtrak argues that the indemnification agreement in the Contract applies to the operation of its train through the work site at Bridge 181, its collision with the work lift, its causation of the injuries and death for which compensation was claimed in this action, the necessity of its defense of the Roberts and Quintiliani claims, and the judgments rendered thereon as a matter of law.  Amtrak claims that notwithstanding the jury verdict, the uncontroverted facts fall squarely within the wording of the indemnification agreement and therefore, that O&G is legally obliged to indemnify and hold harmless Amtrak from the verdicts for which it is obliged and its costs of defense.  Amtrak notes, in particular, the jury's finding that its conduct was not reckless, thus exonerating it from liability for punitive damages.

O&G correctly contends that there was no basis in the evidence for finding it to be responsible for the accident and injuries.  Its memorandum correctly asserts Amtrak's reservation of the right to continue its train operations and its obligation to protect the work site.  O&G's work was allowed to proceed with restrictions designed to permit continued safe train operation, an obligation it clearly fulfilled.  O&G argues that the jury's decision on indemnification was properly based on Amtrak's failure to safely conduct its train operations and protect O&G's

6

workers. Amtrak did not comply with its obligation to do so. It conceded liability to Quintiliani and to the Roberts Estate. Contrary to O&G's argument, this fact does not determine whether Amtrak is entitled to indemnification.

At common law and in Permit attachment A, the incorporated "Specifications Regarding Safety and Protection of Railroad Traffic and Property" standards/procedures were set to allow Amtrak's continued train operations with a focus on safety, to avoid risk and damage to trains and passengers and to those permitted on Amtrak's property, such as O&G's employees.

The fact that Amtrak failed in its obligation to operate its trains safely, as O&G argues, is not challenged for insufficient evidentiary support for the jury's verdict. Amtrak is not precluded by the asserted failure to move at the end of the case. It noted its intent to move as required by Rule 50 of the Federal Rules of Civil Procedure, and the Court noted its awareness of the basis for the motion and reserved judgment. The lack of a detailed recitation of the grounds for the motion was due to the Court's intervention, to which O&G took no exception. Amtrak's reliance on the indemnification agreement in the Contract was apparent.

Nor was the contract right to indemnification foreclosed by the earlier rulings on Motions for Summary Judgment which were restricted to the issue of such rights being enforceable as permitted by federal law, and not foreclosed by state law which was held to be preempted. The merits of Amtrak's claim were not raised by those motions and were not decided.

What is determinative of Amtrak's claim for indemnification is the clear language of the indemnification agreement and the undisputed facts which gave rise to the injury and death claims. There is no ambiguity in the language, which states Amtrak's right to indemnification in words that are definite such that the interpretation and construction of the contract are a matter

for the court. See Tallmadge Bros., Inc. v. Iroquois Gas Transmission Sys., L.P., 252 Conn 479, 495 (2000) ("where there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law") (citations omitted). The indemnity language is clear and precise and leaves no basis for ambiguity, as the agreement is susceptible to but one interpretation. United Illuminating Co. v. Wisvest-Connecticut, LLC, 259 Conn. 665, 670-71 (2002) (holding that "a contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself"). That right is stated to accrue to Amtrak, irrespective of negligence or fault on the part of its officers, directors, employees, agents and servants, from losses, liabilities, claims, causes of action and suits, which it incurs and becomes responsible for, as a result of injury or death to any person, arising out of or in any way resulting from work performed by O&G, its employees, agents or servants. The right accrues and applies in a situation where the injury and/or death of an O&G employee is caused by the sole negligence or fault of Amtrak, its agents, servants or employees. The injury of Mr. Quintiliani and the death of Mr. Roberts, both employees of O&G who were engaged in the work of O&G, has resulted in judgments against Amtrak, as the injury and death were found to be solely caused by negligence and/or fault of Amtrak. In its simplest terms, that factual situation is squarely within the language establishing the obligation of O&G, as the permittee, to indemnify Amtrak from the judgments entered in favor of Mr. Quintiliani and the Roberts Estate.

     The fact that Amtrak was obliged to operate its trains safely, and thereby to protect the O&G work site and its employees there engaged, was not creative of a condition on the right to indemnification. Amtrak's failure to do so had run its course with the injury and death and the imposition of liability therefor in the judgment against it. The right to indemnification, and to be

held harmless, come into play after the accident, when the conduct on which Amtrak's liability was based had run its course. It applied to the cost of defense of the resulting claims and to the judgment entered on the basis of that liability.

O&G argues that the accident, the injuries and death, the lawsuit and the judgment were the result of Amtrak's failure to operate its trains safely, an obligation owed to O&G, which failure materially breached the agreement between Amtrak and O&G and thus foreclosed Amtrak's enforcement of the indemnification provision. O&G thus invokes Amtrak's obligation as a condition precedent to O&G's obligation to indemnify. The argument invokes a factual situation that would vitiate O&G's agreement to indemnify. The argument lacks merit, however, because the factual situation on which O&G relies for being excused from its obligation is exactly the factual situation which gives rise to that obligation. The indemnification provision accrues and applies to situations which cause Amtrak to be held liable, i.e., conduct for which it is responsible causing injury and death to employees of O&G. That conduct is not subject to question as a matter of factual substantiation; the facts are not in dispute. The obligation of O&G to indemnify, as invoked here by Amtrak, is a simple application of an unambiguous articulation of the obligation to the undisputed facts. Amtrak failed to operate trains safely and caused injury to and death of O&G employees, a factual scenario squarely within and described by the Permit provision in which O&G agreed to indemnify and hold harmless Amtrak. To sustain O&G's argument would render the indemnification provision meaningless. The right vested in Amtrak presupposes negligence or fault on its part. O&G's argument that such negligence or fault constituted a material breach of Amtrak's duty to O&G and its employees disregards the indemnification language, which extends to Amtrak protection from being ultimately liable for

any such negligence or fault. If Amtrak's breach of its duty to operate its trains safely allows O&G to avoid indemnification, Amtrak's protection against ultimate responsibility for any unsafe train operation, as provided in the permit, would be nullified.

The effect of O&G's argument is that although O&G agreed that it would indemnify Amtrak if Amtrak was negligent or at fault so as to become liable to an O&G employee for injury or death, it should be excused from any obligation to indemnify Amtrak for Amtrak's negligence or fault. If this were true, the facts that would create a duty to indemnify would also extinguish any duty to indemnify. Indemnification, as contemplated by the parties' Contract, was owed "irrespective of [Amtrak's] negligence or fault." O&G's argument would turn this provision on its head and excuse O&G from any obligation to indemnify in a case of Amtrak negligence or fault.

The function of the Court is to enforce the clear undertaking of parties to an agreement. In this case, the language creative of O&G's agreement to indemnify is unambiguous. The facts are not in dispute as to the conduct for which Amtrak is responsible and which caused the accident, the injury, the death, and the damages found by the jury to be owed to Plaintiff Quintiliani and the Roberts Estate. The indemnification provision squarely embraces those facts and thus obliges O&G, as a matter of law, to indemnify Amtrak for the injury and death damages awarded and the costs of defense of the claims therefor.

**IV.    CONCLUSION**

For the reasons stated herein, Amtrak's Motion for Judgment as a Matter of Law [Doc. No. 286] is **granted**. Judgment shall enter for Amtrak to recover from O&G the amount of damages it shall be obliged to pay Plaintiffs, and for its cost of defense of those claims.

SO ORDERED.

                                    Dated at New Haven, Connecticut, September  11 , 2006.

                                                      /s/
                                        Peter C. Dorsey, U.S. District Judge
                                                     District of Connecticut